## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

GRANITE SOLUTIONS GROUPE, INC.,

     *Plaintiff,*

  v.

             Case No. 1:22-CV-0842 (FJS/CFH)

PIONEER BANCORP INC.; PIONEER BANK;
MICHAEL T. MANN; VALUEWISE CORPORATION
d/b/a APOGEE d/b/a OPTIX CONSULTING, and d/b/a
PRIMACY SEARCH GROUP; CLOUD PAYROLL
LLC; ROSS PERSONNEL CONSULTANTS, INC.,
ALWAYS LIVE HOLDINGS, LLC; KANINGO, LLC;
HIRE FLUX, LLC; HIRE FLUX HOLDINGS, LLC;
VIVERANT LLC, and HEUTMAKER BUSINESS
ADVISORS, LLC,

     *Defendants.*

---------------------------------- X

### COMPLAINT

  **COMES NOW** Plaintiff Granite Solutions Groupe, Inc.,[1] through its undersigned counsel

of record, and for its Complaint against Defendants submits the following:

---

[1] In a companion case against the same named defendants, the plaintiff, Southwestern Payroll, Inc., moved for leave to file a Third Amended Complaint, which includes additional claims and adds Granite Solutions Groupe, Inc., as a named Plaintiff, on October 8, 2021. *Southwestern Payroll Serv., Inc. v. Pioneer Bancorp, Inc., et al.*, 19-cv-1349, Doc. 153. That motion, and Granite Solutions' ability to assert its claims against the defendants, remains pending. Therefore, Granite Solutions files this lawsuit to preserve its claims under any applicable statute of limitations. Should the Court grant Southwestern Payroll leave to file its Third Amended Complaint in *Southwestern Payroll Serv., Inc. v. Pioneer Bancorp, Inc., et al.*, 19-cv-1349, Granite Solutions will dismiss this case without prejudice or, alternatively, move to consolidate the two cases.

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff Granite Solutions Groupe, Inc. ("Granite Solutions" or "Plaintiff") is a California Corporation with its principal place of business in San Francisco, California.

2.      Defendant Pioneer Bancorp, Inc. is a foreign bank, incorporated in Maryland, with its principal place of business in Albany, New York. Pioneer Bancorp, Inc. is the holding company for Defendant Pioneer Bank.

3.   Defendant Pioneer Bank (collectively with Pioneer Bancorp, Inc., "Pioneer") is a stock bank organized and existing under the laws of the State of New York having an address at 652 Albany Shaker Road, Albany, NY 12180.

4.   Defendant Michael Mann ("Mann") is a citizen of the State of New York and is currently incarcerated at Fort Dix Correctional Institution in New Jersey.

5.   Defendant Valuewise Corporation d/b/a Apogee d/b/a Optix Consulting d/b/a Primacy Search Group ("Valuewise") is a Delaware corporation, with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

6.   Defendant Cloud Payroll, LLC ("Cloud Payroll") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon information and belief, none of its manager/members are citizens of the State of California.

7.   Defendant Ross Personnel Consultants, Inc. ("Ross") is a Connecticut corporation with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065.

8.   Defendant Always Live Holdings, LLC ("Always Live") is a Delaware limited

liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information and belief, none of its manager/members are citizens of the State of California.

9.   Defendant Kanigo, LLC ("Kanigo") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information and belief, none of its manager/members are citizens of the State of California.

10.   Defendant Hire Flux, LLC ("Hire Flux") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information and belief, none of its manager/members are citizens of the State of California.

11.   Defendant Hire Flux Holdings, LLC ("Hire Flux Holdings") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information and belief, none of its manager/members are citizens of the State of California.

12.   Defendant Viverant LLC ("Viverant") is a New York limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information, and belief, none of its manager/members are citizens of the the State of California.

13.   Defendant Heutmaker Business Advisors, LLC ("Heutmaker") is a Delaware limited liability company with its principal place of business located at 855 Route 146, Suite 220 and/or 240, Clifton Park, New York 12065. Upon Plaintiff's information, and belief, none of its manager/members are citizens of the State of California.

14. Upon information and belief, Mann, at all times pertinent hereto, controlled and/or owned/partially owned Valuewise, MyPayrollHR, Cloud Payroll, Ross, Always Live, Kanigo, Hire Flux, Hire Flux Holdings, Viverant, and Heutmaker (collectively, the "Entity Defendants").

15. Upon information and belief, at all times pertinent hereto, Mann also partially owned ProData Payroll Services, Inc. ("ProData"), another payroll service bureau like Southwestern Payroll Services, Inc. ("SWP") that was likewise victimized by Mann and Pioneer, as further set forth below.

16. Upon information and belief, at all times pertinent hereto, Mann also controlled and/or owned or partially owned Create Force LLC, FocalPointe Group, LLC, Lincoln Academy, LLC, TrueConsulting Corp., TrueHR, LLC, and Weitz and Associates (collectively with the Entity Defendants, and with ProData and SWP, the "Mann Entities").

17. This Court has jurisdiction of this action pursuant to 28 U.S.C. 1332(a)(1) in that this is an action between citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

18. This Court additionally has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 *et seq.* because an actual case or controversy exists between the parties, as set forth at greater length herein.

19. Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(1), (b)(2).

20. There is a related case, *Southwestern Payroll Service, Inc. v. Pioneer Bank, et al.,* Case No. 19-cv-1349, United States District Court for the Northern District of New York (the "Southwestern Payroll Case"). A motion to amend has been filed in the Southwestern Payroll Case to add Granite Solutions as a plaintiff in that case (Doc. No. 153 filed October 8, 2021). The motion

to Amend has been fully briefed as of November 26, 2021 (Doc. No. 164). Granite Solutions believes that it should be allowed to proceed with its claims in the Southwestern Payroll Case. This lawsuit is only being filed out of an abundance of caution to preserve the statute of limitations on certain causes of action. To the extent Granite Solutions is allowed to proceed as a plaintiff in the Southwestern Payroll Case, this matter will be dismissed. If Granite Solutions is not allowed to proceed in the Southwestern Payroll Case, it will likely move to consolidate this case with the Southwestern Payroll Case.

## **FACTUAL ALLEGATIONS**

21. In 2009, Mann was introduced to David Blessing, Vice President, Commercial Services at Pioneer Bank, who would serve as Mann's relationship partner at Pioneer Bank for the next ten years. Over this time, the two men developed a personal relationship that included frequent golf outings and shared meals. Mann frequently discussed his businesses and business opportunities with Blessing and sought his input with respect to business opportunities.

22. On or about November 2, 2009, Pioneer extended a $2 million revolving line of credit facility to ValueWise (the "ValueWise Loan"). The ValueWise Loan was secured by a blanket lien on ValueWise's assets. By 2019, the credit extended under the ValueWise Loan had grown to $42 million.

23. Over the next decade, Mann established or purchased several other companies, many of which would become subsidiaries of ValueWise. By August 2019, Mann owned or partially owned approximately fifteen companies and had opened a total of thirty-four bank accounts at Pioneer. Pioneer's loan documentation referred to ValueWise as a "conglomerate with four operating divisions, including human resource consulting, physical therapy, payroll services, and finance and accounting consulting."

   A.  In 2013, Mann, through ValueWise, purchased 100% of MyPayrollHR.

   B.  In 2016, Mann, through Cloud Payroll, purchased 51% of ProData.

   C.  In 2017, Mann, through Cloud Payroll, purchased 51% of Southwestern Payroll.

24. Granite Solutions is an employer-client of MyPayrollHR, and Granite Solutions relied on MyPayrollHR to process its payroll and taxes.

25.  MyPayrollHR was a custodian and agent of Granite Solutions for the purpose of payment of payroll taxes to the appropriate taxing authorities.

**Payroll operations.**

26. Payroll and payroll tax processing involves the automated clearing house ("ACH") transfer of a payroll company's clients' payroll liabilities and federal, state, and local taxes associated with a particular payroll into a dedicated account at a bank. After the payroll clients' payroll and tax trust funds are withdrawn from the clients' bank account on a particular payroll date, the funds are held in escrow in a bank account until they are due to be paid to their employees (payroll) and to various taxing authorities (payroll taxes). At that point, another ACH transaction occurs in order to transfer the money from the holding bank account to the employees (payroll) and appropriate taxing authority (payroll taxes).

27. While the movement of money in the ACH process is often thought of as instantaneous, it usually moves over a period of days, with various rules that determine the settlement process and the circumstances under which a bank can reject an ACH transaction, *i.e.*, refuse to settle the transfer.

28. Failure to timely transfer payroll taxes to their appropriate taxing authorities results

in penalties and interest assessments. Federal withholding taxes and most state payroll taxes are due within three (3) days of the payroll being run. Meanwhile, federal and state unemployment taxes are due quarterly. On information and belief, Mann purchased MyPayrollHR, ProData, and Southwestern Payroll for the sole purpose of taking advantage of the "float," that is, the time between when payroll taxes are collected and the time they are to be paid.

29. This method of taking payroll taxes from an employer-client's bank account, holding the funds in a bank account established by the payroll provider until the taxes are due to the taxing authorities is not a unique process to Mann's payroll companies. This method is how all payroll companies in the United States process payroll taxes.

**Pioneer knew Mann would use the MyPayrollHR accounts to process payroll and taxes from the outset, and intended to profit from it.**

30. On November 19, 2013, Mann and Blessing had lunch, and Mann requested that Blessing set up two accounts at Pioneer for MyPayrollHR, which he was in the process of purchasing, that would be used to house and process payroll taxes.

31. On November 21, 2013, Mann submitted an ACH application for ValueWise to Blessing, and informed him that he would need to fill out two more applications for the MyPayrollHR accounts once they were set up. He indicated that the dollar value of ACH transactions in the MyPayrollHR accounts "could be in the millions daily."

32. Blessing forwarded Mann's email to Sandra Dedrick (Commercial Services Officer). Ms. Dedrick responded, indicating that she needed a schedule of transactions because "ACH is expected to be consistent in frequency, like payroll," and that if Mann planned on using "ACH to collect payments in the future he will need a debit limit and will have to be consistent when he takes the payments (the 1st and 15th or every month, etc.)."

33. Shortly thereafter, Account No. ending in 0212 (the "0212 Tax Account") was

created. Because the purpose of the 0212 Tax Account was to house third-party payroll tax funds, in opening the 0212 Account, Pioneer personnel indicated by hand on the account opening documents that the 0212 Tax Account was a "Client Account." In describing the service provided by MyPayrollHR, Pioneer personnel indicated that MyPayrollHR was a "Payroll Svce Bureau."

34. Unlike other Mann Entity Accounts, the 0212 Tax Account was opened as a business checking account to be used in conjunction with a business checking package that included no monthly service charge and no fees for up to 200 transactions/items per month. However, additional items above 200 would be charged $.25 per transaction.

35. On December 3, 2013, Blessing asked Mann whether things went smoothly with the acquisition of MyPayrollHR and whether "the funds that were held by the 3rd party transferred over?" Mann replied that he would "push them to move the funds they are holding" and that they could further discuss any options regarding changes to "the holding account."

36. Between December 17, 2013, and December 31, 2013 – a total of only eleven business days – there were 190 credits/deposits totaling over $5 million, and 65 debits/withdrawals totaling over $3.2 million, in the 0212 Account. The 171 credits bore the description "PAYROLL TAX MANA/TAXDRAFT." For each one, Pioneer also received information identifying the third-party employer that paid the funds. During this time, MyPayrollHR was using the company Payroll Tax Management ("PTM") to process these ACH entries for the collection and payment of taxes.

37. Mann and Blessing discussed whether Pioneer could process these transactions.

38. On April 1, 2014, Mann sent Blessing a copy of MyPayrollHR's contract with PTM. On April 4, 2014, Blessing relayed Mann's plans regarding payroll and taxes to other senior executives at Pioneer, including Joseph Fleming (Senior Vice President & Chief Lending Officer),

Alicia Riegert (Senior Vice President and Chief Information Officer), Craig Furlong (Operations Officer), and Carol Beth Chase (Systems and Product Development Officer).

| | |
|---|---|
| **From:** | David Blessing |
| **To:** | Alicia Riegert; Carol Beth Chase; Craig Furlong; Joseph Fleming |
| **Cc:** | Michael Mann |
| **Subject:** | My Payroll on Line/Valuewise |
| **Date:** | Monday, April 21, 2014 1:41:59 PM |

I had lunch with Mike Mann today. Initially, we are only going to be handling the tax portion of the payroll, which is 100% prefunded with no obligation to forward on the taxes to the appropriate entities if it wasn't received. This will create $0 in credit risk. If we handle it well, his ultimate goal is to move over the actual payroll as well which isn't always pre funded. However we will cross that bridge when we come to it.

39. Ultimately, Pioneer decided it would not venture to serve as Mann's ACH processor, and PTM continued to fulfill that role for a time. Nevertheless, these communications further demonstrate Pioneer's knowledge of the source and nature of the funds in the 0212 Tax Account.

40. Additionally, as mentioned above, in December 2016, Mann purchased ProData, his second payroll service bureau. As a result, the number of transactions in, and the amount of funds flowing through, the 0212 Tax Account increased substantially, as indicated below.

| | December 2015 | December 2016 | December 2017 |
|---|---|---|---|
| Debits | 3,168 | 4,638 | 14,156 |
| Credits | 2,690 | 4,098 | 9,193 |
| Total Funds | $19 million | $60.1 million | $180 million |

41. Because of the extraordinary number of transactions processed in the 0212 Tax Account, Pioneer collected significant monthly fees year over year. Among other things, for every transaction over 200 per month, Pioneer charged the 0212 Tax Account $.25 per transaction. Pioneer referred to these fees as a "Global Item Charge."

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Global Item Charge | $1,831 | $16,739 | $22,604 | $46,421 | $64,412 |

42. On July 3, 2017, Mann emailed Christine Batchelder Charbonneau (Commercial

Services Assistant) about the Global Item Charges. He indicated that he had first thought the charges were from "[their] ACH processor," but determined that those charges were paid separately. Mann requested that, in light of the large volume of transactions in the 0212 Tax Account, the type of account be changed to avoid the fees. Mann promised to "keep a high balance" in the 0212 Tax Account.

43. In response, Charbonneau indicated that she was working with Randall Benedict to see what was "best" for Mann, would confirm with Blessing, and would get back to him.

44. After investigating the issue, Pioneer apparently decided not to change the account and continued to assess Global Item Charges on the 0212 Tax Account.

45. Notably, Pioneer's records establish that Blessing earned about $50,000 as a portion of his annual bonus based in large part on the Global Item Charges to the 0212 Tax Account.

46. In this connection, reports reflecting the Global Item Charges applied to specific accounts at Pioneer were circulated to senior executives of Pioneer, including Fleming, Blessing, and other customer relationship managers.

47. The Global Item Charges generated from the 0212 Tax Account were exponentially higher than those of any other account at Pioneer and resulted in substantial bonuses for Blessing

48. In 2017, Blessing went to MyPayrollHR's office to tour the payroll processing facility. After the tour, Blessing had a meeting with John Reinke, the CEO of Mann's payroll operations. During that meeting, the two discussed the fact Mann was having the payroll tax dollars housed in accounts at Pioneer. Blessing not only knew that Pioneer was housing payroll tax dollars at Pioneer Bank, but Blessing also stated that he and Pioneer Bank liked the large deposits in the tax accounts because it increased the bank's borrowing base.

49. Also in 2017, there was a meeting at Pioneer Bank with potential investors in Mann's payroll companies. During this meeting, which John Reinke was also present, Blessing again discussed the payroll tax account at Pioneer Bank.

**Pioneer assists Mann in opening MyPayrollHR account ending in 0428, which was established to process payroll payments.**

50. In September 2014, Mann opened another MyPayrollHR account after informing Pioneer he was "working on other products/offerings for the payroll business." The MyPayrollHR account ending in 0428 (the "0428 Payroll Account") was opened on September 16, 2014, but was used infrequently until early 2016.

51. In March 2016, MyPayrollHR began to use the 0428 Payroll Account to issue payroll checks on behalf of MyPayrollHR employer-clients to their employees. The 0428 Payroll Account was funded by transfers from the 0212 Tax Account.

52. From January 2018 through August 2019, payroll checks were issued from the 0428 Payroll Account that listed the payor either as "MyPayrollHR.Com LLC" or one of multiple employers, including "Elevate Staffing" of Glendale, California; "Cape Cleaning" located in Newport News, Virginia; "Wallace Enterprises, Inc." located in Fairfax, Virginia; "Bertram Enterprises, Inc." located in Morrisville, North Carolina; "D.B.& K. Enterprise, Inc." located in Virginia Beach, Virginia; and "Angels on Care Homecare LLC" located in Carmel, New York.

53. Thus, the information available to Pioneer regarding the transactions in the 0428 Payroll Account clearly showed that the account was used to process third-party payroll.

**In 2019, Pioneer opened three new Cloud Payroll accounts for the purpose of processing third-party payroll and tax payments, and Pioneer employees routinely assisted with the processing of such payments.**

54. In January 2019, Mann began the process of opening an account at Pioneer for Cloud

Payroll that would receive payroll payments via wire from third-party employers. On January 15, 2019, Mann received an email from Matthew Schilling (Cloud Payroll Manager of Finance) suggesting that Mann open an account to receive prefunded wire payments from third-party employers.



**From:** Matthew Schilling ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, January 15, 2019 1:46 PM
**To:** Michael Mann ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Michael Mann
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Wire-in account
Hi Mike,
I was wondering if you ever had a chance to setup a wire account.
We have one small client that constantly NSFs and right now they owe us $8k. We have W2's held over their head as collateral, as in we won't send them until we have payment. I wanted to explore the possibility of having them prefund payrolls by wiring us and then having the ACH draw off of our account. This is one client that makes me nervous but there are a few violators that could stand to have a prefund option.
Let me know if you have a chance to set up the account.
Thanks,

**Matthew Schilling**
*Manager of Finance*
Office: 518.348 ▮▮▮
Cell: 518.723 ▮▮▮
@cloudpayroll

55. Mann agreed with Schilling's proposed approach and copied Matthew Roberts (Cloud Payroll employee), instructing him to contact Pioneer directly to open the account. Roberts forwarded the entire email conversation to Trudy Seeber (Branch Manager/Business Development Officer) and Deborah Salsburg (Sales Leader and Assistant Branch Manager) at Pioneer and asked them to review the discussion "regarding opening a business wire account" and to send him "any forms or information to start the setup."

56. Salsburg provided the account opening paperwork, completely filled out and marked where Mann needed to sign.

From:      Deborah A. Salsburg
To:        Matthew Roberts; Michael Mann
Cc:        Trudy Seeber
Subject:   SECURE MESSAGE
Date:      Wednesday, January 16, 2019 10:50:40 AM

Hello,

Attached is the paperwork you requested for the new Cloud Payroll LLC account. I marked everywhere that Mike needs to sign.

Mike, if you could also shoot me an email about the business not operating in NY as you have done previously.

As soon as you get the paperwork back to me I will get it opened in the system.

Thank you!

Deb

**Deborah Salsburg**
**Sales Leader/Assistant Branch Manager NMLS# 481820**

57. Pioneer was thus fully aware that the purpose of the new account was to receive, house, and process third-party employer payroll payments.

58. It was Pioneer representatives, not Mann, who checked certain boxes on the paperwork "No" with respect to the questions of whether Cloud Payroll was a "non-bank or third-party payment processor" or a "Money Services Business as defined in 31 CFR §1010.100(ff)," knowing that Cloud Payroll was a "payroll company."

59. In any event, though, Cloud Payroll was not a "non-bank or third-party payment processor," nor was it a "Money Services Business as defined in 31 CFR §1010.100(ff)."

60. On January 29, 2019, Mann wanted to open another Pioneer account for Cloud Payroll. As before, Deborah Salsburg sent Mann the documents fully prepared and marked where Mann needed to sign. She indicated in her cover email that she could open the account once the signature was received.

61. Once again, Pioneer personnel – not Mann – checked the "No" boxes on the paperwork with respect to the questions as to whether Cloud was a "non-bank or third-party payment processor" or a "Money Services Business as defined in 31 CFR §1010.100(ff)."

62. On February 25, 2019, Mann again emailed Salsburg and Seeber to request the

13

opening of a third Cloud Payroll account, indicating that the payroll company was "collecting money from multiple locations."



From: Michael Mann ███████████████████████
Sent: Monday, February 25, 2019 2:02 PM
To: Deborah A. Salsburg ███████████████████
Cc: Trudy Seeber ██████████████████████
Subject: Cloudpayoll

Hi Deb and Trudy. I hope both of you are still doing well.

Actually, I need to set up another Cloudpayroll, LLC bank account. We are collecting money from multiple locations and want to make sure we keep them separate.

Can you send me the paperwork to sign when you get it done?

Thanks,
Mike

63. That same day, Seeber responded that they would "get [the paperwork] out to you tomorrow morning." The next morning, Salsburg sent Mann the completed paperwork marked where he needed to sign.



From:        Deborah A. Salsburg ███████████████████████]
Sent:        2/26/2019 3:20:21 PM
To:          'Michael Mann' ██████████████████]; Trudy Seeber ███████████████████]
Subject:     SECURE MESSAGE
Attachments: Cloud Payroll LLC.pdf

Hi Mike,

Here is the paperwork as requested.

You know the drill. Once I get it back, I will get the account opened and shoot you an email.

I hope you enjoy this less windy day today!!!

Talk to you soon,

Deb

Deborah A. Salsburg
Sales Leader/Assistant Branch Manager NMLS# 481820
P/F: 518.██████
E: ████████@pioneerbanking.com

64. Mann signed the prepared paperwork and returned it, and Salsburg told him the account was "all set" and that he should be able to see it online in "a day or two." Pioneer assigned this account with a number ending in 2440 (the "2440 Tax Account").

65. In March 2019 there were over 1,000 transactions in the 2440 Tax Account, with over $22 million moving in and out of the account.

66. In April 2019, the number of transactions in the 2440 Tax Account increased to nearly 10,000. 1,551 checks written from the account were paid, and over $92 million moved through the account. The account statement for the 2440 Tax Account for April is 300 pages long.

67. It was clear from even a cursory review of information in Pioneer's possession that the 2440 Tax Account was being used to process tax payments. On most business days, hundreds of credits were listed, all of which were labeled "CLOUDPAYROLL/TAX COL." For example, the following are only some of the credits to the 2440 Tax Account on April 2, 2019:

| | Account Number | XXXXXX2440 |
| | Statement Date | 04/30/2019 |
| | Statement Thru Date | 04/30/2019 |
| | Page | 6 |

**TRANSACTION DETAIL (Continued)**

| Date | Description | Deposits | Withdrawals | Balance |
|---|---|---|---|---|
| Apr 02 | CLOUDPAYROLL/TAX COL | | | |

68. The ACH transaction details received by Pioneer and reflected in its internal records clearly identified the thousands of third-party employers that paid the tax funds deposited into the 2440 Tax Account.

69. The amount of activity in the 2440 Tax Account remained substantial through

August 2019:

|  | May 2019 | June 2019 | July 2019 | August 2019 |
|---|---|---|---|---|
| Debits | 1,104 | 645 | 2,351 | 729 |
| Credits | 8,222 | 7,362 | 8,147 | 7,568 |
| Total Funds | $107 million | $97 million | $102.7 million | $102.5 million |

70. Pioneer routinely provided Mann with assistance in processing payroll and tax payments. At Mann's request, or the request of other agents or employees of MyPayrollHR and Cloud Payroll, Pioneer employees would frequently wire payments from the 0212 Tax Account to third-party employees, the IRS, and other taxing authorities.

71. Pioneer personnel also routinely provided Mann with copies of checks written from the 0212 or 2440 Tax Accounts, all of which were made payable to taxing authorities and identified the third-party employers on whose behalf the tax payments were made.

72. Thus, it was no secret at Pioneer that the 0212 Tax Account and 2440 Tax Account were used to house and process payroll and tax funds for MyPayrollHR, Southwestern Payroll, and ProData.

**Pioneer granted Mann remote deposit capture privileges across his accounts in astonishingly high amounts.**

73. Remote Deposit Capture ("RDC") is a deposit transaction delivery system that allows commercial customers the ability to deposit checks into Pioneer accounts from a remote location and avoid a trip to the bank. Once a customer is approved for RDC, Pioneer installs a bank-provided scanner and software at the customer's remote location.

74. During the relevant period, Pioneer's RDC policies and procedures recognized various legal, compliance, reputational, and operational risks associated with RDC operations, including increased risk of money laundering and fraud. Pioneer's RDC policies and procedures required that customer due diligence and assessment be performed at the time of an RDC

16

application, and that certain annual, periodic, and daily reviews be performed to detect any suspicious activities.

75. In June 2018, Mann requested and received RDC privileges with respect to four of his ValueWise accounts, each with a daily maximum of $25,000. Mann signed an RDC agreement on June 28, 2018. That same day, Pioneer and Mann amended the RDC agreement to add two additional accounts, one held by Ross Personnel and the other by TrueConsulting Corp. It appears that Pioneer did not engage in due diligence or assessment prior to granting these RDC privileges.

76. On July 19, 2018, Mann requested an increase in the RDC amounts for all but one of these accounts to a daily maximum of $600,000 per check and $1.2 million in total per account. Blessing approved an increase in the amounts *beyond* what Mann requested, to $650,000 per check and a daily maximum of $1.3 million.

77. Pioneer continued to grant Mann RDC privileges with more and more of his accounts, always at the same unusually high levels. Mann merely had to ask, and such privileges were granted.

78. For example, in January 2019, Mann contacted Joshua Engel (Pioneer Cash Management Officer) and Blessing to request that three additional accounts be given RDC privileges and instructed that the same maximum amounts be used consistent with the other accounts.

From: Michael Mann ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Wednesday, January 30, 2019 2:27 PM
To: Joshua W. Engel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Cc: David Blessing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Subject: Adding accounts

**SENT FROM EXTERNAL SOURCE**

Josh...
I hope you are doing well. We need to add three companies to the remote deposit. If we send money between them electronically our system creates a two day delay in receiving the funds. Therefore, remote deposit will be a better option for us in the near future.
We will use the same limits on these accounts that we use on the others. They would have a per check maximum of $650,000 and a daily maximum of $1,300,000. They account numbers are as follows:

| Account Name | Account Number |
|---|---|
| Pro Data Payroll Services | ▮▮▮1988 |
| SouthWestern Payroll Services | ▮▮▮1996 |
| CloudPayroll | ▮▮▮2382 |

Thanks,
Mike

79. In granting these additional privileges, Pioneer merely asked that Mann sign the RDC service agreement and application, which Pioneer personnel had completed for him.

80. By August 2019, 18 accounts controlled by Mann had RDC privileges, and all but one of the accounts had $650,000 per check and $1.3 million per day maximums.

81. Usually, a customer would not have access to the deposited funds until the checks cleared. However, Pioneer gave Mann instant access to the deposited funds and allowed him to deposit (and then instantly withdraw) up to $1.3 million per day in each of 17 accounts. Mann was thus able to circumvent the usual restrictions on access to funds deposited by check and had immediate access to up to $22.1 million *per day*.

**Pioneer encouraged, and at times even required, that Mann cover overdrafts in his other accounts with the payroll and payroll tax funds of MyPayrollHR, Southwestern Payroll, and ProData's employer-clients' Trust Funds.**

82. Mann began experiencing account overdrafts in his non-payroll related accounts on a regular basis in 2014. When overdrafts occurred, Pioneer would put a hold on the overdrawn account(s). Mann would ask Pioneer to pay the overdraft amounts, indicating that he had the funds in other accounts and would move funds from the other accounts to the overdrawn accounts. Mann routinely referenced the balance in all his accounts, including the 0212 Tax Account (the only

Mann Entity account that routinely had a substantial positive balance at that time) to justify paying the overdrafts.

83. Without exception, Pioneer would pay the outstanding items, thus extending Mann credit until he had time to divert tax Trust Funds to cover the overdrawn balances in his other accounts.

84. Mann's overdrafts were so frequent and substantial that eventually Pioneer insisted that Mann move the funds into the overdrawn account before Pioneer would pay the outstanding items(s), and Pioneer employees would check the account(s) to ensure that he had moved the money before any items were paid.

85. Pioneer's senior executives were well aware of Mann's use of the payroll and tax funds in the 0212 Tax Account and the 2440 Tax Accounts to cover overdrafts.

86. For example, on Sunday, January 8, 2017, Mann emailed Blessing to request assistance in paying two checks drafted against a ValueWise account, indicating that he had failed to "move the money."

> On Jan 8, 2017, at 1:03 PM, Michael Mann ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
>
> David...
>
> On Friday I made a mistake. I needed to move about 950K to account ending in 3648 and I did not. Our balance on all our accounts is over 1M so I had the money. I just did not move the money.
>
> Can you make sure that checks 5378 and 5379 get paid from account 3648?
>
> Sorry about that and thank you very much for your help.
>
> Mike

87. Blessing responded that day to Mann's email, indicating that he was "on it" and directing Benedict to "make sure they get paid[.]" Fleming gave his approval as well.

88. To cover the overdraft, Mann transferred $400,000 from the 0212 Tax Account to the ValueWise 3648 account.

89. On July 20, 2017, Mann emailed Blessing, Benedict, and Charbonneau, indicating

19

that he needed assistance in paying certain items, and would "have plenty of money when the ach

payments hit this morning in the accounts" and would "move the money to the right accounts"

later that morning.

**From:** Michael Mann ████████████████████████
**Sent:** Thursday, July 20, 2017 5:19 AM
**To:** David Blessing ██████████████████; Randall Benedict ████████████████; Christine
Batchelder ███████████████████
**Subject:** Assistance

I have a few items in both account ending in 3622 and 3630 that I need assistance paying.  I apologize for not being on
top of this.  I will have plenty of money when the ach payments hit this morning in the accounts.  I will move the money
to the right accounts when I land around 8:45 am.

I appreciate the assistance.

Thanks,

Mike

90. Benedict forwarded the email to Blessing and Fleming, indicating that "ValueWise

has three items for a total of $2,101,114.00 being presented against a balance of -$100.00" and

"Ross Personnel has three items for a total of $2,108,869.00 being presented against a balance of

-$99.62." Fleming received the emails and responded: "Randy please pay and either charge or

waive [overdraft fees] based on what we normally do."

Pioneer's records show that on that same day, July 20, 2017, in a series of six-figure, round-dollar

transfers, Mann moved funds from the 0212 Tax Account to cover the overdrafts in the Ross

Personnel                                                                                             account:

| Description | Source Short Description | Source Full Description | Sub Source | Effective Date | Credit $ | Debit $ |
|---|---|---|---|---|---|---|
| NSF Charge | Internal Trn | Internal Trans (Demand Deposit) | DD | 7/19/17 | 0 | 105 |
| 907-Ross Personn/PAYROLL | Return Itm | Return Item Processing | | 7/19/17 | 0 | 657,824 |
| 907-Ross Personn/PAYROLL | Return Itm | Return Item Processing | | 7/19/17 | 0 | 697,278 |
| 907-Ross Personn/PAYROLL | Return Itm | Return Item Processing | | 7/19/17 | 0 | 753,769 |
| Rev: NSF Charge | Rtn Itm Fees | Return Item Processing Fees | FEE | 7/19/17 | 105 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 643,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 600,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 498,000 | 0 |
| Internet Transfer From 0212 | Online Bnk | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 486,000 | 0 |

91. Pioneer's records similarly show that Mann transferred Trust Funds from the 0212

Tax Account to the ValueWise 3622 account to cover the overdraft in that account, again in a series of six-figure, round-dollar transfers:

| Description | Source Short Description | Source Full Description | Sub Source | Effective Date | Credit $ | Debit $ |
|---|---|---|---|---|---|---|
| NSF Charge Internal Trn | | Internal Trans (Demand Deposit) | DD | 7/19/17 | 0 | 105 |
| 904-ValueWise Co/PAYROLL Return Itm | | Return Item Processing | | 7/19/17 | 0 | 653,379 |
| 904-ValueWise Co/PAYROLL Return Itm | | Return Item Processing | | 7/19/17 | 0 | 697,452 |
| 904-ValueWise Co/PAYROLL Return Itm | | Return Item Processing | | 7/19/17 | 0 | 750,283 |
| Rev: NSF Charge Rtn Itm Fees | | Return Item Processing Fees | FEE | 7/19/17 | 105 | 0 |
| Internet Transfer From 0212 Online Bnk | | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 993,000 | 0 |
| Internet Transfer From 3614 Online Bnk | | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 690,000 | 0 |
| Internet Transfer From 0212 Online Bnk | | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 660,000 | 0 |
| Internet Transfer From 0212 Online Bnk | | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 490,000 | 0 |
| Internet Transfer From 0212 Online Bnk | | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 472,000 | 0 |
| Internet Transfer From 0212 Online Bnk | | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 465,000 | 0 |
| Internet Transfer From 0212 Online Bnk | | FIDELITY ONLINE BANKING | OLB | 7/20/17 | 200,000 | 0 |

92. Similarly, on August 10, 2017, Mann emailed Blessing and Benedict, indicating that he needed help getting items paid in certain accounts. Mann assured them that "[w]e have over 7M in all of our accounts that is significantly more money than we need for the items to be paid." At the time of his email, the 0212 Tax Account had an account balance of approximately $7.7 million.

93. Benedict forwarded the email to Blessing, informing him that ValueWise had four items for over $2.5 million being presented against a balance of $935, and Ross Personnel had five items for over $2.79 million being presented against a balance of $254,491.38.

94. Blessing directed Benedict to "pay and waive" [honor the checks/debits from the account, and waive any overdraft fees], and forwarded the emails to Frank Sarratori, asking that he "concur." Sarratori approved, based on his understanding that Mann routinely transferred money from other accounts to cover any overdrafts. Ultimately, Mann moved money from the 0212 Tax Account to cover the negative balances:

From:       Frank Sarratori █████████████████████████
Sent:       8/10/2017 12:01:35 PM
To:         David Blessing ██████████████████; Randall Benedict ████████████████
Subject:    RE: Help paying items

Based upon my understanding as explained by Dave Blessing, this occurs monthly and money is transferred from the other accounts Mike has with us to cover the extended credit, I concur with Dave to pay and waive.

Frank

95. For further example, on December 21, 2017, Mann emailed Blessing, Benedict, and Charbonneau indicating that he would "need assistance in paying items" in certain of his accounts. He further indicated that there was over $14 million in the other Pioneer accounts. At the time, the 0212 Tax Account had an account balance of approximately $14.7 million.

96. Benedict forwarded the email to Christopher Seftner (Commercial Services Liaison) who informed Blessing, Fleming, and Benedict that ValueWise had three items totaling $1,909,395 being presented against a balance of $198,613, and Ross had four items totaling $2,410,222 begin presented against a balance of -$138.37.

97. Blessing then forwarded the email chain to Amell, Fleming, and Benedict indicating that the problem is that Mann had the money but "in the wrong accounts" and requesting that Amell "pay and waive."

From: David Blessing
Sent: Thursday, December 21, 2017 8:27 AM
To: Christopher J. Seftner ███████████████████; Thomas L. Amell ████████████████
Cc: Joseph Fleming ████████████████; Randall Benedict ████████████████
Subject: RE: NSF

Tom, As discussed Mike has a total of $14,000,000 in the bank it is just in the wrong accounts. Please approve to pay and waive. We have never had a problem with doing this.

98. With no questions asked, Amell responded a minute later "Approved to pay and waive." Later that day, Mann transferred $3.36 million from the 0212 Tax Account to other Mann Entity Accounts.

99. By August 2019, there were near-daily overdrafts in the Mann Entity Accounts.

Pioneer's records establish that Pioneer officers repeatedly endorsed Mann's diversion of the third-party payroll and tax funds from the 0212 Tax Account and 2440 Tax Account to cover the overdrafts.

100. For example, on August 1, 2019, Mann emailed Blessing and Benedict requesting assistance in paying eight items totaling nearly $6 million from the ValueWise 3648 account and indicating that sufficient funds were then in the account. Benedict reviewed the account and confirmed that funds had been deposited to the account.

101. Pioneer's records show that on August 1, 2019, Mann diverted $4.57 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account.

| | | | |
|---|---|---|---|
| | Account Number | XXXXXX2440 | |
| | Statement Date | 08/30/2019 | |
| | Statement Thru Date | 09/02/2019 | |
| | Page | 11 | |

TRANSACTION DETAIL (Continued)

| | | | |
|---|---|---|---|
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 730,000.00 | 5,290,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 876,000.00 | 4,414,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 987,000.00 | 3,427,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 988,000.00 | 2,439,871.18 |
| Aug 01 | INTERNET TRANSFER TO CHECKING-0212 | 989,000.00 | 1,450,871.18 |

102. Mann then diverted $5.394 million in third-party payroll and tax funds from the 0212 Tax Account to cover the overdrafts in the ValueWise 3648 account:

**BUSINESS CHECKING**      **Account Number: XXXXXX3648**

Account Owner(s):    VALUEWISE CORPORATION
                       DBA PRIMACY SEARCH GROUP

**Balance Summary**

| | |
|---|---|
| **Beginning Balance as of 08/01/2019** | **$501,341.16** |
| + Deposits and Credits (63) | $44,812,492.45 |
| - Withdrawals and Debits (86) | $45,313,173.98 |
| **Ending Balance as of 08/31/2019** | **$659.63** |
| Service Charges for Period | $0.00 |
| Average Balance for Period | $1,543.00 |
| Average Collected for Period | $1,543.00 |
| Minimum Balance for Period | $647.00 |

**TRANSACTION DETAIL**

| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 989,000.00 | -4,379,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -3,391,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 987,000.00 | -2,404,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 986,000.00 | -1,418,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 985,000.00 | -433,265.35 |
| Aug 01 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 450,000.00 | 16,734.65 |

103. On August 8, 2019, Mann emailed Benedict requesting assistance in paying items totaling over $12 million in a ValueWise account ending in 3648 and a TrueConsulting Corp. account ending in 1251 and stated that the money was in the accounts to cover the items.

104. Benedict emailed Blessing with the issue after having reviewed the accounts to confirm the transfers, and Blessing approved the payments.

105. To partially cover the overdrafts, Mann first moved $4,206,000 from the 2440 Tax Account to the 0212 Tax Account:

| | Account Number | XXXXXX2440 |
| | Statement Date | 08/30/2019 |
| | Statement Thru Date | 09/02/2019 |
| | Page | 37 |

**TRANSACTION DETAIL (Continued)**

| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 256,000.00 | 3,959,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 986,000.00 | 2,973,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 987,000.00 | 1,986,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 988,000.00 | 998,365.29 |
| Aug 08 | INTERNET TRANSFER TO CHECKING-0212 | 989,000.00 | 9,365.29 |

106. Mann then diverted $4.946 million in third-party tax and payroll funds from the 0212 Tax Account to the ValueWise 3648 account to cover the overdrafts.

| | Account Number | XXXXXX3648 |
| | Statement Date | 08/30/2019 |
| | Statement Thru Date | 09/02/2019 |
| | Page | 2 |

**TRANSACTION DETAIL (Continued)**

| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -3,940,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 989,000.00 | -2,951,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -1,963,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 986,000.00 | -977,352.77 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 985,000.00 | 7,647.23 |

107. Mann also diverted $3.214 million in third-party payroll and tax funds from the 0212 Tax Account to the TrueConsulting Corp. 1251 account to cover the overdrafts.

Account Number     XXXXXX1251
Statement Date     08/30/2019
Statement Thru Date   09/02/2019
Page                2

**TRANSACTION DETAIL (Continued)**

| | | | |
|---|---|---|---|
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 989,000.00 | -2,218,289.22 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 988,000.00 | -1,230,269.22 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 987,000.00 | -243,289.22 |
| Aug 08 | INTERNET TRANSFER FROM MYPAYROLLHRC-0212 | 250,000.00 | 6,710.78 |

108. On August 12, 2019, Mann emailed Benedict to request assistance in paying fourteen items totaling over $9 million from the Ross 3630 account. Benedict reviewed the account and forwarded Mann's email to Blessing and Fleming, indicating that sufficient funds were in the account to cover the items. Blessing and Fleming approved.

109. Pioneer's records show that on August 12, 2019, Mann diverted $1.232 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account and diverted $4.478 million in third-party payroll and tax funds from the 0212 Tax Account to the Ross Personnel 3630 account to partially cover the overdrafts.

110. On August 13, 2019, Benedict emailed Mann and indicated the two ValueWise accounts were overdrawn and asked whether Mann would be making a deposit to cover the items. Mann responded that the money was in the accounts to cover the items.

111. Benedict reviewed the accounts and informed Blessing and Fleming that sufficient funds had been transferred to the accounts.

Hello Dave,

Valuewise 3622, has 6 items for a total of $4,239,069.87 being presented against a balance of $363,666.58. Current balance is $4,243,166.

Valuewise 3648, 7 items for a total of $4,893,426.30 being presented against a balance of $345,166.55. Current balance is $4,896,072.

112. Blessing approved payment of the items. Pioneer's records show that Mann moved

$1.867 million in third-party tax funds from the 2440 Tax Account to the 0212 Tax Account, and then diverted $5,132,500 in third-party tax and payroll funds from the 0212 Tax Account to partially cover the overdrafts.

Account Number XXXXXX0212
Statement Date 08/30/2019
Statement Thru Date 09/02/2019
Page 43

**TRANSACTION DETAIL (Continued)**

| Date | Description | Deposits | Withdrawals | Balance |
|---|---|---|---|---|
| Aug 13 | 9112- HUMAN CAPI/BILL COLL | 15.00 | | 7,829,265.76 |
| Aug 13 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 989,000.00 | | 8,818,265.76 |
| Aug 13 | INTERNET TRANSFER FROM CLOUD PAYROL-2440 | 878,000.00 | | 9,696,265.76 |
| Aug 13 | INTERNET TRANSFER FROM WEITZ AND AS-3945 | 35,000.00 | | 9,731,265.76 |
| Aug 13 | INTERNET TRANSFER FROM WEITZ AND AS-3945 | 35,000.00 | | 9,766,265.76 |
| Aug 13 | INTERNET TRANSFER FROM CLOUD PAYROL-2366 | 22,000.00 | | 9,788,265.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 22,500.00 | 9,765,765.76 |
| Aug 13 | INTERNET TRANSFER TO 0428 | | 30,000.00 | 9,735,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 279,000.00 | 9,456,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3648 | | 876,000.00 | 8,580,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 986,000.00 | 7,594,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 988,000.00 | 6,606,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3648 | | 989,000.00 | 5,617,765.76 |
| Aug 13 | INTERNET TRANSFER TO CHECKING-3622 | | 989,000.00 | 4,628,765.76 |

**The money laundering and check kiting scheme comes crashing down.**

113. By August 2019, Mann was spending several hours a day orchestrating hundreds of transactions among the Mann Entity Accounts, including diverting third-party payroll and tax funds to other accounts, kiting millions of dollars between Bank of America and Pioneer, gaining instant access to the kited funds via Pioneer's RDC privileges, and was moving money around in his Pioneer accounts to cover overdrafts.

114. Immediately after Pioneer increased the ceiling of the ValueWise Loan from $32 million to $42 million on August 12, 2019, Mann requested and received an additional disbursement of $8.1 million, bringing the total amount of principal outstanding to over $40 million.

115. By August 28, 2019, the outstanding principal on the ValueWise Loan had swelled to $41,590,894.90.

116. On August 29, 2019, Mann made a principal payment toward the ValueWise Loan of $2.9 million using third-party tax funds diverted from the 2440 Tax Account.

117. On August 29, 2019, Mann deposited 36 checks written from four accounts he controlled at Bank of America totaling $15,588,000 into twelve accounts he controlled at Pioneer (by depositing three six-figure, round-dollar checks into each of the twelve accounts, with the three checks in each account totaling $1.299 million, which was of course just below the $1.3 million daily RDC cap for each account). Just as it had done nearly every day for the past several months, Pioneer immediately credited the checks to the Mann Entity Accounts in the amount of the deposits, in effect giving the Mann Entities an interest-free loan totaling $15.588 million. This enabled Mann to write 39 checks totaling $18,043,000 from those twelve accounts back to the accounts at Bank of America. Pioneer immediately paid Bank of America $18,043,000, which included most of the $15,588,000 credit extended by Pioneer.

118. On August 30, 2019, Bank of America abruptly froze accounts controlled by Mann, and refused to pay the 36 Bank of America checks totaling $15,588,000. This caused the twelve Mann-controlled accounts at Pioneer Bank to be overdrawn. None of the twelve overdrawn accounts were held by MyPayrollHR or Cloud Payroll, the named owners on the 0212 and 2440 Tax Accounts and the 04288 Payroll Account.

119. Significantly, at the time Bank of America returned the checks on August 30, 2019, the outstanding balance on the ValueWise Loan had risen to nearly $39 million in the eighteen days since August 12, 2019, when the loan was increased by $10 million to $42 million. Between the overdrafts and its share of risk on the ValueWise loan, Pioneer was facing potential losses of over $31,000,000.00. Thus, Pioneer's executive team was desperate to recover any funds it could from any available source.

120. At approximately 4:30 p.m. on August 30, 2019, Joseph Fleming, Senior VP and Chief Lending Officer at Pioneer, contacted Mann, and they agreed that, consistent with past practices, the Trust Funds would be used to cover Mann's debts and Pioneer's potential losses. They further agreed that Mann would no longer have access to any bank accounts at Pioneer, and that Pioneer would not permit any withdrawals from the accounts but would allow deposits, thus ensnaring the third-party tax and payroll funds that would continue to accumulate in the 0212 Tax Account and 2440 Tax Account. They agreed that Mann would not disclose their plan to any third parties.

121. Pioneer then implemented a "partial" freeze of the Mann-controlled accounts. Pioneer halted all posting of any transactions in the Mann-controlled accounts on August 30, 2019 and spent the next several days analyzing all credits/deposits to, and debits/withdrawals from, those accounts. Among the transactions scheduled for August 30, 2019 were over 700 ACH credits/deposits to the 2440 Tax Account totaling over $6 million in Trust Funds. Pioneer's records establish that each credit entry was identified as "TAX COL" and included the name of the third-party employer that had paid the tax funds.

122. On September 3, 2019, Pioneer employees, including Kim Catello (Deposit Operations Analyst), David Hunn (formerly VP, Deposit Operations, now VP, BSA and Identity Theft Officer), and Sula Landi (VP, Controller), prepared or reviewed spreadsheets that listed all suspended August 30, 2019 credit/deposits and debits/withdrawals in the Mann Accounts, and indicated which debits/withdrawals would be allowed and which would be returned.

123. The spreadsheets reflected that millions of dollars in third-party payroll and tax funds were available for deposit to the MyPayrollHR and Cloud Payroll accounts. Nonetheless, the spreadsheets further reflect that Pioneer decided to return and refuse to honor all third-party

debits/withdrawals from the Mann Entity Accounts, including all legitimate debits/withdrawals from the 0212 Tax Account, the 0428 Payroll Account, and the 2440 Tax Account, none of which had overdrafts. Indeed, none of the MyPayrollHR or Cloud Payroll accounts had overdrafts or negative balances.

124. At approximately 8:57 p.m. on September 3, 2019, Mann sent an email to Tim Burke, who was working with Pioneer, instructing that there were significant funds in the "tax account," and that more money would be coming into the account. He also indicated that he had probably moved about $3 million from the "tax account" to pay down the "line," *i.e.*, the ValueWise Loan.

> **From:** Michael Mann < ████████████████████ >
> **Date:** September 3, 2019 at 20:57:31 EDT
> **To:** Timothy Burke < ████████████████████ >
> **Subject:** Cover
>
> Tim....
>
> There was probably close to 1.9M to cover tomorrow morning from the tax account. I did move probably 3M to the line from the tax account on Friday.  There is more money coming in tomorrow to cover the 452K that Matt discussed.  However, my guess is there was not enough money in their today.
>
> Again, Pioneer should see it on the report tomorrow.  Obviously, if I would have known this was going to happen on Friday, I would have left the money in the account.
>
> Also, I do hope you get to BofA soon.  My guess is they have the remainder to cover future tax liabilities.
>
> Thanks for helping today.  Again, I just wanted to make you aware based on numbers I see in the tax reports.  I could be wrong but probably not.
>
> Thanks,
>
> Mike

125. Burke then forwarded the email to Blessing and Fleming, who in turn forwarded the email to Tom Amell, Frank Sarratori, Patrick Hughes (Chief Financial Officer), and Laura Mazzara (Executive Vice President and Chief Risk Officer).

126. Thus, as of September 3, 2019, Pioneer's senior officers were unquestionably aware that there were substantial third-party tax funds in the "tax account" at Pioneer. At the very least, Pioneer had a duty to investigate the source of the funds in the 2440 Tax Account.

**Pioneer Caused Third-Party Tax Funds to Accumulate in the Tax Accounts.**

127. Between August 30, 2019 and September 3, 2019, with no knowledge that Pioneer was blocking debits/withdrawals from the 0212 and 2440 Tax Accounts, MyPayrollHR, Southwestern Payroll, and ProData continued to authorize the ACH transactions of their employer-customers tax trust funds.

128. On September 3, 2019, Pioneer posted all suspended August 30, 2019 and September 3, 2019 credits/deposits to the Mann-controlled accounts. The 2440 Tax Account had a positive balance of $8,883,528.54 by end of day September 3, 2019.

129. Also on September 3, 2019, Pioneer senior executives received an email from Mann indicating that there was approximately $1.9 million in the "tax account" and more would be coming in the next day. Mann also indicated in his email that he believed he had diverted about $3 million from the "tax account" to pay down the ValueWise loan on August 30, 2019.

130. Pioneer waited until the last possible moment to return (reject) any ACH debits/withdrawals to the Mann-controlled accounts. By waiting until the last minute, Mann's payroll service bureaus, including MyPayrollHR, ProData, and Southwestern Payroll, would not and could not have known that Pioneer was blocking withdrawals yet allowing deposits until the morning of September 4, 2019, which was too late to stop any ACH credits/deposits to the accounts previously sent or scheduled that day.

131. On September 4, 2019, Pioneer senior executives met with Mann and his attorney for the better part of the day. At this time, Mann wanted Pioneer to release the third-party funds in the MyPayrollHR and Cloud Payroll accounts, otherwise the payroll companies would be destroyed and worthless. Mann testified under oath that he and his attorney specifically discussed

with Pioneer's outside counsel that Mann's payroll businesses processed both payroll and taxes, and the fact that payroll and tax funds were housed at Pioneer Bank.

132. On the morning of September 4, 2019, Matthew Schilling, CFO of Mann's payroll companies, went to Pioneer Bank to try to get Pioneer Bank to release the payroll and payroll tax funds. Schilling met with Pioneer Bank's general counsel, Frank Sarratori, and another woman. Schilling explained the fact Pioneer Bank was holding payroll funds. Mr. Sarratori listened to Mr. Schilling, then told him they could not talk about the subject because Schilling was not the account holder.

133. At 4:42 PM EST on September 4, 2019, John Reinke had a twenty-three-minute phone call with Mr. Sarratori and Thomas Amell (President of Pioneer Bank). During this call, Mr. Reinke explained that Pioneer Bank was housing payroll tax funds in the 2440 Tax Account, and that they needed to be released so they could be paid to the appropriate taxing authorities.

134. Nonetheless, Pioneer refused to release any funds unless Bank of America agreed to pay the 36 checks totaling $15,588,000 deposited in the Mann-controlled accounts at Pioneer. Pioneer's executive team cared only about Pioneer's bottom line and covering its losses, and undoubtedly calculated that its victims— companies such as Plaintiff and other employer-clients of MyPayrollHR, Southwestern Payroll, and ProData who were mostly small businesses scattered throughout the country—lacked the time and money to recover their payroll and tax funds. In fact, Mr. Sarratori has testified that Pioneer Bank decided that it needed to hurry up and take the payroll tax funds before anyone else could claim the funds.

135. Ultimately, Pioneer and Mann agreed that, notwithstanding the immense harm it would cause thousands of employers and employees across the country, including some of Pioneer's own customers, Pioneer would transfer the third-party payroll and tax monies in the

MyPayrollHR and Cloud Payroll accounts to Pioneer's general ledger account or otherwise credit these Trust Funds to the ValueWise Loan, all in order to offset Pioneer's potential losses.

136. Pioneer thus diverted at least $2.8 million in third-party tax funds deposited in the 2440 Tax Account to pay down the ValueWise Loan. Pioneer further decided it would manipulate the dates on which transactions were posted to make it appear as though Mann had made this payment on August 30, 2019.

137. By the end of the day on September 4, 2019, the 2440 Tax Account should have had a positive balance of $10,628,738.17. However, through a series of highly suspect transactions, Pioneer not only emptied the 2440 Tax Account, but intentionally caused the account to have a negative balance.

138. At 6:30 p.m. on September 4, 2019, Pioneer transferred $6,845,944.84 from the 2440 Tax Account to Pioneer's general ledger account.

139. Pioneer also posted six transfers totaling $6,845,000 from the 2440 Tax Account to the 0212 Tax Account and used $2.8 million of those funds to pay down the ValueWise loan, even though none of those monies belonged to ValueWise.

140. Specifically, Pioneer transferred $2.8 million from the 0212 Tax Account to an account held by Defendant Weitz and Associates (the "Weitz Account"), then transferred the funds from the Weitz Account to a ValueWise account ending in 3614 (the "ValueWise 3614 Account"), and from there used the funds to reduce the balance on the ValueWise loan.

141. Pioneer manipulated the posting of these transactions by backdating some of them to conceal its wrongdoing. Pioneer posted the debit/withdrawal of tax funds from the 2440 Tax Account as of September 4, 2019 but posted the credits/deposits of those same funds to the 0212 Tax Account and the subsequent transfers to the Weitz Account and Valuewise 3614 Account as

of September 3, 2019. And while Pioneer posted the debit/withdrawal of the tax funds from the Valuewise 3614 Account as of September 3, 2019, it posted the payment of those funds to the Valuewise loan account as of August 30, 2019.

142. Thus, according to Pioneer's records, the $2.8 million in third-party tax funds Pioneer diverted from the 2440 Tax Account on September 4, 2019, moved *backwards in time* to pay down the ValueWise Loan on August 30, 2019.

143. Pioneer falsely claims that it was entitled to seize the funds in the 0212 and 2440 Tax Accounts to cover the overdrafts in other Mann Entity Accounts. However, Pioneer had no set off rights with respect to the 0212 or 2440 Tax Accounts because, among other reasons, no MyPayrollHR or Cloud Payroll accounts had overdrafts and Pioneer knew the funds were third-party tax/treasury payments.

144. In furtherance of its money laundering scheme, Pioneer also deceived many third-party employers, including both large and small companies, libraries, and other not-for-profits, that inquired about their payroll or tax funds "frozen" in accounts at Pioneer. In letters and emails, Pioneer's General Counsel, Frank Sarratori, misleadingly claimed that Pioneer never provided "payroll services, ACH tax wiring services, tax filing services or other payroll related services" to MyPayrollHR or Cloud Payroll, when, in fact, Pioneer had routinely provided such services. Sarratori also failed to disclose that Pioneer had seized the very funds these companies were trying to locate. Instead, he instructed that any inquiries should be directed to MyPayrollHR, and Cloud Payroll, knowing that those entities were shuttered because of Pioneer's illegal actions.

145. Pioneer's selective return of debit/withdrawal entries violated the rules governing the ACH system that are enforced by the National Automated Clearing House Association ("NACHA"), the not-for-profit association that oversees the ACH system.  In returning the entries,

Pioneer used a return code indicating that the accounts were frozen. However, NACHA rules prohibit the use of that code when a bank selectively returns entries as Pioneer had done, *i.e.,* accepting credits/deposits but rejecting debits/withdrawals.

146. However, in response to a complaint filed with NACHA, Pioneer abandoned its initial defective defense that the accounts were frozen, and instead falsely claimed that at the time it returned the debit entries initiated for payment of the tax funds to various taxing authorities, "there were no funds available [to] cover the dollar value of the debit entry" in the 2440 Tax Account. To the contrary, when Pioneer returned the debit entries at the end of the day on September 3, 2019, there was over $8 million in the 2440 Tax Account. Thus, there was plenty of money in the account to cover all the debit entries initiated. As a result of this and other lies, NACHA concluded that a violation of the rules did "not appear to have occurred."

147. Nearly all the money that was converted by Pioneer and was subsequently used to pay down the ValueWise Loan was in fact third-party tax funds, i.e. the Trust Funds belonging to Plaintiff and other employer-clients of MyPayrollHR, Southwestern Payroll, and ProData.

148. Pioneer insists it is entitled to keep millions of dollars knowing that the money belongs to thousands of employers (and ultimately various taxing authorities) across the country because the MyPayrollHR and Cloud Payroll accounts that were used to house the funds were opened by Pioneer as general depository accounts, not trust accounts, and Pioneer employees were somehow oblivious to the open and unmistakable fact that Mann had been using the accounts to process billions of dollars in third-party payroll and tax payments for years.

**Pioneer's BSA Department Likewise Knew of the Nature of Mann's Third-Party Payroll Operations, Knowledge Derived from Duties Imposed Upon it by Law, But Relaxed its Oversight With Respect to Mann**

149. Pioneer's feigned defense – that it did not know the nature or source of the funds

in the third-party payroll and payroll tax accounts prior to its conversion of these funds – is so unbelievable, not only because all the email and other communications, lending documents, account opening documents, and other materials proving its pre-existing knowledge, but also because it had a duty to know the nature and source of its customer's accounts.

150. Pioneer is required to abide by federal and state banking laws, regulations, and guidelines, including the USA Patriot Act, the BSA, and related anti-money laundering ("AML") regulations.

151. BSA/AML provisions require financial institutions to develop (a) effective compliance programs to detect and prevent money laundering, (b) effective customer due diligence systems and monitoring programs, and (c) an effective suspicious activity monitoring and reporting process, among many other things. If suspicious activity signaling criminal activity is detected, financial institutions are obligated to file suspicious activity reports ("SARs") with the U.S. Treasury's Office of Financial Crimes Enforcement Network ("FinCEN").

152. One purpose of these requirements is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place in their clients' accounts. BSA/AML guidance instructs banks and other financial institutions on how best to achieve that goal and what actions to take once suspicious activity is identified. Moreover, under federal and state law, Pioneer had a duty to operate in a manner that protects the public interest, maintains public confidence in its business, and maintains the safe and sound conduct of its business.

153. Financial institutions must fully understand the business in which their customers are engaged. This duty, referred to as the responsibility to "Know Your Customer" ("KYC"), is critical to determining what activity is suspicious. When opening an account, KYC due diligence

is vital because the information obtained serves as a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest criminal activity and guides the bank in other BSA/AML areas such as alert management, investigation, and suspicious activity reporting.

154. Financial institutions must also have in place systems that are triggered when there is suspicious activity or "red flags." Such industry-standard "red flags" include unexplained, repetitive, and unusual transactions in bank accounts, high-volume payments without logical explanation, transfers sent and received by the same person using different accounts, large, round dollar transactions, and the immediate withdrawal of funds deposited to an account.

155. When such systems are triggered, the bank must thoroughly investigate the account activity and determine whether the information should be reported to the FinCEN. Reportable activity includes, among other things, transactions where the bank has a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering, and transactions that have no business, apparent lawful purpose, or are not the sort in which the customer would normally be engaging.

156. Consistent with these requirements, Pioneer's own policies required it to "have a clear and concise understanding of all bank customer practices" in order "to ensure the immediate detection and identification of suspicious activity."

157. Beginning in approximately 2014, Pioneer failed to execute its BSA/AML compliance programs effectively, if at all, when it came to Mann. Pioneer's BSA/AML programs and systems were compromised because Mann was considered one of the most, if not the most, important customers of Pioneer. Moreover, Pioneer did not want to take any action that might cause a default on the ValueWise Loan and other loans extended to the Mann Entities.

158. While the various Mann Entity Accounts were reviewed for suspicious activity more than one hundred sixty times from 2017 through August 30, 2019, not once did Pioneer perform any serious analysis of the accounts, nor did it report any suspicious activities to FinCEN.

159. Rather, Pioneer BSA/AML compliance employees usually just copied and pasted the information from prior entries on their internal spreadsheets, instead of investigating and reporting the money laundering and kiting activities that were evident in the Mann Entity Accounts.

160. There were innumerable suspicious transactions in the Mann Entity Accounts, all of which should have not only triggered thorough investigations but also reports to regulators. In 2019, nearly half of the Mann Entity Accounts reflected a pattern of frequent, and at times daily, six and seven-figure, round-dollar mobile deposits, followed immediately by withdrawals of most if not all of the deposits, usually by check, in large, round-dollar amounts. These transactions involved no third parties, but rather the movement of money between Mann Entity Accounts and even between accounts held by the same Mann Entity. The transactions reflect quintessential kiting and money laundering activity, all of which was or should have been obvious to Pioneer.

161. The frequent overdrafts in the Mann Entity Accounts were also "red flags" that required investigation but were ignored by Pioneer. Senior officers at Pioneer, including Blessing, Fleming, Sarratori, and Amell were well aware that the Mann Entity Accounts routinely experienced six and seven-figure overdrafts, yet no one at Pioneer ever investigated any underlying issues or reported the overdrafts to Pioneer's BSA department.

162. Pioneer's failure to investigate the Mann Entity accounts was particularly egregious

and confounding considering the substantial loans that Pioneer extended to Mann's companies. Pioneer's policies should have required additional monitoring of the Mann Entity Accounts, yet such monitoring was superficial at best.

163. Its failure to investigate the 0212 Tax Account was also particularly egregious considering that Pioneer had identified MyPayrollHR (the 0212 Tax Account holder) as a "high risk" customer, which required Pioneer to engage in enhanced due diligence and closely monitor MyPayrollHR's accounts.

164. Ultimately, Pioneer also failed to engage in proper due diligence with respect to the ValueWise Loan. Pioneer allowed Mann himself to dictate and substantially limit the scope of any audit or field exam. Pioneer also accepted at face value Mann's representations concerning the financial health of his companies and the work performed by his outside auditors.

165. Had Pioneer acted prudently, followed its own policies, and complied with its BSA/AML and related obligations, Mann's bank fraud, money laundering, and kiting schemes would have been detected and reported to FinCEN at least as early as 2017.

166. In December 2019, the FDIC conducted a Safety and Soundness Exam, and concluded that Pioneer's BSA/AML compliance programs were, in Pioneer's words, "fundamentally and materially deficient." Pioneer entered into a Memorandum of Understanding with the FDIC that required it to improve and enhance its programs and hire qualified BSA staff.

167. Pioneer's records establish that Pioneer personnel for years routinely provided Mann and his payroll companies substantial assistance in the processing of third-party payroll and taxes from the MyPayrollHR and Cloud Payroll accounts. There is simply no plausible basis to believe that Pioneer's employees were ignorant of the fact that MyPayrollHR and Cloud Payroll were operating as payroll companies and were using their accounts to process payroll and taxes.

168. Pioneer BSA compliance employees routinely reviewed the 0212 Tax Account, including when it triggered a suspicious activity alert due to the volume of transactions in the account. The reviewing employees would conclude that the extraordinary number of transactions was not suspicious because MyPayrollHR had been a long-time customer and the activity in the account was typical for a payroll company.

169. For example, Ellen Fogarty (VP, BSA and ID Theft Officer) documented her review of the 0212 Tax Account on September 14, 2017, March 13, 2018, April 26, 2018, September 21, 2018, October 30, 2018, and November 14, 2018.  Her review was nearly identical each time, indicating that MyPayrollHR had been a customer since 2013, that the transactional activity in the account was typical for this customer, and there was "no negative information."

170. On July 24, 2018, Kelli Rappleyea (BSA Analyst) reviewed the 0212 Tax Account as the result of a suspicious activity alert, and she reported as follows: "June review revealed foreign wire activity. Transactions appear reasonable. No suspicious activity detected." In June 2018, there were 8,623 credits and 12,233 debits in the account, with over $139 million flowing in and out of the account that month.

171. On January 17, 2019, Darlene Julian (BSA Risk Specialist) reviewed the December 2018 activity in the 0212 Tax Account. As noted above, in December 2018, there were 9,607 credits and 5,054 debits in the account, with over $216 million flowing in and out of the account that month. Julian compared this activity to that in December 2017 and concluded that there was a pattern of high activity in the account, but that it was not suspicious.

172. On February 20, 2019, Fogarty reviewed the January activity in the 0212 Tax Account, which consisted of over 18,000 transactions and more than $185 million moving through the account. She reviewed the April activity in the 0212 Tax Account on May 6, 2019, which

consisted of over 6,500 transactions and more than $121 million moving through the account. In both instances, Fogarty concluded this activity was consistent for MyPayrollHR and was not suspicious.

173. On May 15, 2019, Julian reviewed the April 2019 activity in the 0212 Tax Account, which included more than 6,500 transactions and more than $121 million moving through the account. Julian concluded that this activity was consistent and "reasonable" for MyPayrollHR.

174. On August 27, 2019, shortly before Mann's schemes collapsed, Fogarty reviewed the July activity in the 0212 Tax Account, which included over 6,000 transactions and more than $158 million moving through the account. Fogarty found no issue with this volume of activity.

175. Pioneer's BSA department personnel either knew and understood that the 0212 Tax Account was used to process payroll and taxes or, as discussed below, they were deliberately ignorant and utterly reckless in the performance of their duties in order to claim ignorance of the nature of the account and the source of its funds.

176. Information gathered by Pioneer's BSA compliance staff was presented monthly to Pioneer's SAR Committee, which was composed of representatives from Pioneer Executive Management, Legal, Compliance, Retail, Audit, Risk Management and Security Departments.

177. From 2014 through at least March 2017, SAR Committee members received a monthly ACH log that listed all debits and credits of at least $5,000 in Pioneer accounts, including the 0212 Tax Account. ACH logs circulated in January, February, and March 2017 each listed over 2,000 ACH transactions in the 0212 Tax Account. In March 2017, the MyPayrollHR ACH transactions constituted over seventy percent of all the transactions listed in the ACH log. The description of most of the ACH transactions included a third-party employer name with the term

"TAXES," "PAYROLL," "DIR DEP," and "AGENCY," and there were also many transactions described as "IRS/USATAXPYMT."

178. Like Pioneer's BSA compliance employees, Pioneer's SAR Committee similarly dismissed the alerts and extraordinary volume of transactions in the 0212 Tax Account on the grounds it was consistent with the transactional activity of a payroll company.

**Mann has been held to account for his crimes, but Pioneer has not.**

179. Mann has admitted that from 2013 through September 2019, he engaged in a fraudulent scheme to deceive banks and financing companies into loaning his companies millions, and later tens of millions, of dollars. Because he could not repay the loans with legitimate business revenues, he diverted millions of dollars in payroll and payroll tax funds housed in accounts at Pioneer. Mann also engaged in a kiting scheme, using checks, wire transfers, and the Automated Clearing House ("ACH") system to rapidly transfer millions of dollars, including third-party payroll tax dollars, among various accounts he controlled at Pioneer and Bank of America, to give the appearance of business assets far in excess of reality.

180. On August 12, 2020, Mann pled guilty to federal charges of bank fraud, wire fraud, identity theft, and filing false tax records. On August 25, 2020, Mann pled guilty to one count of money laundering under New York State law in Saratoga County Court. On August 4, 2021, Mann was sentenced to serve twelve years in federal prison and eight to twenty-eight years in state prison.

181. Mann has further admitted that his payroll service bureaus, MyPayrollHR, ProData, and Southwestern Payroll, were legitimate businesses, and their day-to-day operations were directed not by Mann, but by individuals who had no knowledge of Mann's wrongdoing. Mann did, however, open and control the bank accounts at Pioneer in the names of MyPayrollHR,

ProData, Southwestern Payroll, Cloud Payroll, and others. Mann insisted, and Pioneer agreed, that he be the sole point of contract with respect to all accounts at Pioneer.

182. There is no question that Mann's conduct was egregious, but it was Pioneer that aided and abetted him for years, and then knowingly caused the collapse of MyPayrollHR and Cloud Payroll and the resulting harm to thousands of other employers and employees throughout the country. Even today Pioneer chooses to pay its team of lawyers millions of dollars to pursue frivolous defenses rather than forfeit the third-party tax funds for return to Pioneer's and Mann's true victims.

183. While federal and state authorities have investigated Mann's misconduct, it is unclear whether these authorities have investigated Pioneer's role in his money laundering scheme or Pioneer's diversion and conversion of third-party payroll and tax funds or Pioneer's conspiracy with Mann. Even if such investigations have occurred, on information and belief, Pioneer has misrepresented facts and fraudulently concealed relevant records, emails, and other information that refute its frivolous justifications for its retention of the Trust Funds.

184. For example, in a letter to the Securities Exchange Commission filed September 29, 2020, Pioneer falsely claimed, among other things, that it had an "express policy" against customers using their accounts to process payroll (it does not), that Mann "lied" to Pioneer regarding the nature of use of the funds in the 0212 and 2440 Tax Accounts, and the 0428 Payroll Account (he did not), that Pioneer did not know those accounts were used to process third-party payroll and tax payments (Pioneer knew), and that Pioneer had a right to set off the third-party funds under its agreements and New York State law (it did not). Conspicuously absent from Pioneer's fictional account of events is the fact that Pioneer knowingly diverted $2.8 million in third-party tax funds to reduce the balance on the ValueWise loan, among other facts noted above.

185. Pioneer also represented to the SEC that there were no "red flags" in the accounts controlled by Mann before August 30, 2019. However, by no later than May 2019, there were sufficient "red flags" in the accounts controlled by Mann to set a bank regulator's hair on fire. In addition to the near-daily six and seven-figure overdrafts, the transactions in nearly half of the thirty-four Mann-controlled accounts consisted exclusively of six and seven-figure, round-dollar mobile deposits and same-day withdrawals, usually by check, with tens of millions of dollars moving daily between the Mann-Entity accounts.

186. Pioneer not only agreed to allow Mann to use the 0212 and 2440 Tax Accounts to receive and house third-party payroll and tax funds, it also understood and agreed to allow Mann to divert the third-party payroll and tax funds to other Mann Entity Accounts to cover any shortfalls in such accounts and pay down the ValueWise Loan. Pioneer sanctioned these diversions and even encouraged Mann to move the funds.

187. As a result, Mann could and often did use his RDC privileges to kite over $20 million per day.

188. Notwithstanding these high limits, Mann occasionally requested that his daily maximum be increased on a particular day, and Pioneer, of course, agreed. No questions asked.

189. By granting Mann RDC privileges for nearly twenty accounts and granting him instant credit for any RDC deposits, Pioneer facilitated Mann in kiting millions of dollars in non-existent funds daily between accounts at Bank of America and Pioneer.

190. Mann's kiting made his accounts look larger and his businesses appear more active than they really were. The inflated numbers gave the illusion that the Mann consulting companies were large, successful Pioneer customers. In July 2019, bolstered by this false image, Pioneer completed its reorganization from a mutual savings bank to a mutual holding company and held

its initial public offering. Pioneer benefitted greatly from its relationship with Mann, that is until Bank of America disrupted the enterprise.

191. At the time of Pioneer Bank's partial freeze, Granite Solutions had authorized its payroll service provider, MyPayrollHR to transfer approximately $416,866.62 in payroll taxes from Granite Solutions' account into Pioneer Bank through ACH transactions. MyPayrollHR was acting as custodian of the funds and agent for Granite Solutions with the responsibility to transmit these funds to the appropriate taxing authorities when they came due.

### FIRST CAUSE OF ACTION
### (DECLARATORY JUDGMENT – AGAINST PIONEER)

192. Plaintiff incorporates the allegations contained in paragraphs 1 through 191 above as if fully recited herein.

193. Granite Solutions transferred approximately $416,866.62 into the 2440 Tax Account at Pioneer that was never withdrawn for payment of taxes.

194. Pioneer has seized these funds, claiming that the funds were pledged as collateral for the Valuewise Loan, or alternatively, were set off against overdrafts in other Mann Entity accounts. This is Pioneer's contention despite its knowledge that the funds in the 2440 Tax Account were third-party funds paid by employers for deposit to the IRS and other taxing authorities, and despite the fact that there were no overdrafts in the 2440 Tax Account or any other Cloud Payroll or MyPayrollHR accounts.

195. Pioneer was obligated to investigate the source of the funds in the 2440 Tax Account prior to setting off any funds in the account, and Pioneer's own records clearly reveal that the funds in the account were third-party tax payments, not the funds of Cloud Payroll, Mann or any of the Mann Entities.

196. Mann and the Entity Defendants have not challenged Pioneer's ability to seize these

payroll and tax funds, and worked in concert with Pioneer in order that the payroll and tax funds be used to reduce his/its/their debt(s) to Pioneer and to reduce Pioneer's purported losses.

197. Granite Solutions has demanded that Pioneer return its tax trust funds to it, with penalties and interest, which demand Pioneer has refused.

198. This case involves an actual, substantial controversy between the parties.

199. Granite Solutions seeks a declaration with respect to the rights of the parties vis-à-vis the tax trust funds, and specifically a declaration that Pioneer wrongfully seized the funds and that it must return Granite Solutions twice-paid tax trust funds to it and disgorge any interest or profits it has earned by way of its wrongful retention of the tax funds.

<u>**SECOND CAUSE OF ACTION**</u>
**(CONVERSION)**

200. Plaintiff incorporates the allegations contained in paragraphs 1 through 199 above as if fully recited herein.

201. Pioneer, through its improper partial "freezing" of the 2440 Tax Account and its seizure and diversion of all third-party funds in the account, has knowingly and wrongfully converted $416,866.62 belonging to Plaintiff, to which it has no right of possession.

202. Pioneer continues to exercise unauthorized and wrongful possession and control over the Trust Funds to the exclusion of Granite Solutions.

203. Pioneer knew that the Trust Funds in the 0212 and 2440 Tax Accounts and the 0428 Payroll Account were not the property of Mann, the Mann Entities, or Pioneer, and the funds could not be pledged as collateral for the $42 million loan or be used to set off any Mann Entity overdrafts.

204. Pioneer and Mann knew and agreed that Pioneer would accept the credit/deposit

entry side of the transfers and would delay return of the debit/withdrawal entry side of the transfers, which would necessarily result in MyPayrollHR, Southwestern Payroll, and ProData continuing to fund any credit/deposit entries to the accounts housing the Trust Funds.

205. The funds at issue were deposited into Pioneer by ACH transfer initiated by MyPayrollHR as an agent for Granite Solutions. MyPayrollHR was a custodian of the funds and acting pursuant to a contract between MyPayrollHR and Granite Solutions.

206. The evidence in this case will show that Pioneer knew what was going on in the 2440 Tax Account, wanted it to go on, and helped Mann establish the tax accounts in the manner in which they were functioning on August 30, 2019.

207. As a result of Pioneer's selective rejection of ACH entries, the debit/withdrawal entries which would have remitted the tax funds to the proper taxing authorities were blocked, and Pioneer purposefully delayed rejection of the debit entries for several days so all parties involved, from Plaintiff and its payroll service provider, would remain unaware of Pioneer's true intentions.

208. Mann and the Entity Defendants failed to challenge Pioneer's ability to seize the Trust Funds and worked in concert with Pioneer in order that the Trust Funds be used to reduce Mann's debt and Pioneer's losses.

209. Defendants' wrongful conversion of the Trust Funds has caused the Plaintiff to suffer damages, including collective tax fund related losses in excess of $416,866.62, double payment of payroll liabilities, and other damages that will continue to accrue until the tax liabilities are paid to the appropriate taxing authorities.

210. Plaintiff seeks all damages allowable by law against Defendants, including

compensatory and punitive damages, interest, costs, attorneys' fees, and accounting fees. Plaintiff seeks all damages allowable by law against Pioneer for its wrongful and unauthorized possession and control over the tax trust funds.

211. Plaintiff is entitled to an order requiring that Pioneer disgorge any interest or profits it has earned by way of its wrongful retention of the tax funds.

## THIRD CAUSE OF ACTION
### (FRAUD)

212. Plaintiff incorporates the allegations contained in paragraphs 1 through 211 above as if fully recited herein.

213. Plaintiff's fraud claim involves Trust Funds which were deposited with Pioneer between August 30, 2019 and September 4, 2019. Beginning on or about August 30, 2019, Pioneer allowed all credits/deposits to the Mann-controlled accounts, including the 0212 and 2440 Tax Accounts and 0428 Payroll account, but ultimately rejected all legitimate debits/withdrawals from the accounts. Pioneer purposefully delayed returning ACH debit/withdrawal entries so that the returns would not be received until September 4, 2019, knowing that Trust Funds would amass in the 0212 and 2440 Tax Accounts and the 0428 Payroll account and Pioneer could seize any deposits. Moreover, instead of telling executives or employees of MyPayrollHR, Southwestern Payroll, ProData, or anyone else that there was an issue with Mann, Pioneer purposefully continued to accept the Trust Funds into the accounts, but froze outgoing transactions to prevent the funds from being paid to the appropriate taxing authorities.

214. This case is not simply a dispute about whether the Trust Funds belong to Pioneer or the taxing authorities. Plaintiff alleges that Pioneer purposefully stopped all outgoing ACH transactions from the accounts housing Trust Funds, but allowed money to keep flowing into the accounts beginning August 30, 2019 and continuing until the partial freeze was discovered, in a

purposeful and fraudulent attempt to obtain as much money as possible to satisfy the ValueWise

Loan and/or offset overdrafts in other Mann accounts, even though Pioneer knew the Trust Funds

were not Mann's money, but instead were monies to be held in trust and remitted to employees

(payroll) and the proper taxing authorities to which the funds were due (payroll taxes).

215. Pioneer knew that by delaying returns, MyPayrollHR, Southwestern Payroll,

ProData, and the other payroll service bureaus owned by Mann, and the ACH processing

companies with which they contracted, would rely on Pioneer's acceptance of credit entries and

silence as to debit entries as indication that the Mann Entity Accounts were not frozen, and would

continue to make deposits to the accounts.

216. Pioneer's conduct in this manner violated NACHA Operating Rules, was

unprecedented, and was not foreseeable to anyone other than Pioneer. Mann and the Entity

Defendants enabled and ratified Pioneer's conduct for their own selfish purposes.

217. Pioneer had a duty to disclose to the owners of the Trust Funds its intention to

freeze outgoing ACH transactions, based on Pioneer's superior knowledge of Mann's activities

and its fiduciary duty to allow Plaintiff's Trust Funds to be paid to their employees (payroll) and

taxing authorities (payroll taxes).

218. The confidential and fiduciary relationship is established by statute, case law, and

special circumstances.

219. 26 U.S.C. § 7501 provides: "Whenever any person is required to collect or withhold

any internal revenue tax from any other person and to pay over such tax to the United States, the

amount of tax so collected or withheld shall be held to be a special fund in trust for the United

States …."

220. The United States Supreme Court has also found that payroll taxes, once collected,

are to be held in trust. In *Begier v. I.R.S*, 496 U.S. 53 (1990), the Court reviewed at what point a trust is created with respect to 26 U.S.C. § 7501. *Id.* The United States Supreme Court held that a trust for tax collections is created at the time wages are paid by an employer because it is at that point the tax withholding occurs. *Id.* at 61-62.

221. Further, there are special facts which create a fiduciary and/or confidential relationship between Pioneer and Plaintiff by virtue of Pioneer's receipt and holding of the Trust Funds.

222. Pioneer had superior knowledge, which was not readily available to Granite Solutions, namely that it had frozen only outgoing transactions from the accounts housing the Trust Funds, but was continuing to allow credits to the accounts, with the intent to use the accumulation of these funds to offset the ValueWise Loan and/or overdrafts in other Mann-controlled accounts. Pioneer's success in accumulating as much money into these accounts as it possibly could, to offset the defaulted ValueWise Loan and other account overdrafts and recover its losses, hinged on its ability to act in a clandestine manner. Pioneer knew that by accepting credit entries but denying and delaying debit entries, the payroll services bureaus, and their ACH processors, all on behalf of the employer-clients of each of these payroll service bureaus, including Granite Solutions, would continue to act on their mistaken belief that the accounts were operating as they always had – payroll and payroll taxes into the holding accounts for a time, and payroll and payroll taxes permitted to be paid out when due.

223. There were literally thousands of payroll and payroll tax transactions that went in and out of the 0212 and 2440 Tax Accounts, and/or the 0428 Payroll Account each day, and there is no feasible way to monitor whether Pioneer would be honoring the ACH transactions in real time. It takes weeks, months, or in certain circumstances, quarters (90 days) before an employer

company might receive notice from taxing authorities that tax payments have not been made. Plaintiff could not have learned of what Pioneer did any sooner through the exercise of ordinary intelligence.

224. Plaintiff was reasonably operating under a mistaken belief of a material fact. Namely, Plaintiff reasonably believed that if Pioneer accepted the credit entries for the Trust Funds, it would also allow and accept the debit entries which were to initiate payment from the 0212 and 2440 Tax Accounts, and/or the 0428 Payroll Account, to the appropriate employees and taxing authorities, as it had done for years.

225. Pioneer knew the funds in the 0212 and 2440 Tax Accounts, and the 0428 Payroll Account, were Trust Funds, and this situation is exactly the type of special circumstance which creates a fiduciary relationship sufficient for Plaintiff to maintain a fraud claim.

226. Plaintiff seeks all damages allowable by law against Pioneer for its fraudulent and wrongful collection and retention of the Trust Funds, including $416,866.62, penalties and interest assessed and to be assessed from the taxing authorities, loss of profits, damages for reputational harm, interest, costs, attorneys' fees, and that Pioneer be required to disgorge any interest it has earned by way of its fraudulent acquisition and retention of the tax trust funds.

### FOURTH CAUSE OF ACTION
### (NEGLIGENCE/GROSS NEGLIGENCE)

227. Plaintiff incorporates the allegations contained in paragraphs 1 through 226 above as if fully recited herein.

228. All Defendants owed a duty to Plaintiff to keep and maintain the Trust Funds in trust for payment to its employees and/or the taxing authorities.

229. All Defendants knew that the Trust Funds paid into the 0212 and 2440 Tax

Accounts, and/or the 0428 Payroll Account, were collected by Mann's payroll service bureaus, such as MyPayrollHR, Southwestern Payroll, and ProData, after being collected from their third-party employer customers, and that these businesses would collectively be harmed if ACH credits/deposits were allowed but ACH debits/withdrawals were returned, or if the third-party employer Trust Funds were converted by Mann or Pioneer.

230. Defendants intentionally diverted the Trust Funds to other accounts to cover overdrafts, to pay down the ValueWise Loan, or otherwise used the funds for improper purposes.

231. Defendants failed to adequately monitor and supervise the Trust Funds.

232. Defendants agreed that Mann and the Entity Defendants could pledge the MyPayrollHR and Cloud Payroll accounts as collateral for the ValueWise Loan, even though all Defendants knew that the MyPayrollHR and Cloud Payroll accounts were used to process third-party payroll and tax payments, and could not be pledged as collateral for the ValueWise Loan.

233. In issuing the ValueWise Loan, Pioneer had a duty to engage in credit underwriting and due diligence, and to ensure that Mann and the Entity Defendants had sufficient liquidity and assets with respect to the ValueWise Loan, and to ensure that any accounts that were pledged as collateral for the ValueWise Loan did not include third-party payroll or tax funds.

234. Pioneer's due diligence with respect to the ValueWise Loan was grossly deficient.

235. Pioneer had a duty upon opening any of the Mann Entity Accounts to gain an understanding, independent of any forms completed for or by Mann, of the purpose and anticipated use of the account, the expected volume of activity in the account, and source of funds in the account. Pioneer also had a duty to monitor the Mann Entity Accounts for suspicious activities and report suspicious activity to FinCEN.

236. Moreover, under federal and state law, Pioneer had a duty to operate in a manner

that protects the public interest, including that it insures the safe and sound conduct of its business, maintain public confidence in its business, and protect the interests of the public, depositors, creditors, shareholders and stockholders.

237. Pioneer deliberately ignored its obligations and any suspicious activities in the Mann Entity Accounts.  Pioneer failed to use the ordinary care of a reasonably prudent bank under the same or similar circumstances and failed to exercise adequate banking standards of care specifically in relation to the 0212 Tax Account, the 2440 Tax Account, the 0428 Account, and the other Mann Entity Accounts. Had Pioneer fulfilled these obligations, Mann's schemes would have ended, and no harm would have come to the third-party employers such as Plaintiff.

238. Mann and the Entity Defendants had a duty to challenge Pioneer's conversion of the Trust Funds, but instead have colluded with Pioneer and acquiesced in Pioneer's misconduct.

239. Defendants have breached their duties to Granite Solutions.

240. Defendants' negligence, willful misconduct, gross negligence, and reckless actions have caused damages to Plaintiff. Defendants' conduct is so careless and reckless as to show a complete disregard for the rights and safety of others and the consequences of Defendants' actions or inactions.

241. Defendants' negligence, gross negligence, willful misconduct and reckless actions have caused Plaintiff to suffer damages, including the loss of over $416,866.62 in tax funds due to various taxing authorities, double payment of payroll liabilities, tax delinquency penalties and interest, accrued and accruing, and other damages that will continue to accrue until the Trust Funds, in particular the tax trust funds, are paid to the appropriate taxing authorities.

242. Plaintiff seeks all damages allowable by law against Pioneer for its fraudulent and

wrongful collection and retention of the Trust Funds, including compensatory and punitive damages, interest, costs, attorneys' fees, and accounting fees. Plaintiff seeks all damages allowable by law against Pioneer for its wrongful and unauthorized possession and control over the Trust funds.

**FIFTH CAUSE OF ACTION**
**(UNJUST ENRICHMENT/MONEY HAD AND RECEIVED – PIONEER)**

243. Plaintiff incorporates the allegations contained in paragraphs 1 through 242 above as if fully recited herein.

244. Prior to September 5, 2019, Plaintiff effectuated the transfer of $416,866.62 in payroll tax liabilities to the 0212 and 2440 Tax Accounts, and or the 0428 Payroll Account at Pioneer, none of which has been paid to the appropriate parties.

245. Pioneer has been unjustly enriched by its conversion and retention of these Trust Funds. By allowing Pioneer to retain the Trust Funds to offset their obligations to Pioneer, Mann and the Entity Defendants have been unjustly enriched.

246. Pioneer's conversion and retention of funds was at the expense of Plaintiff.

247. Pioneer's losses with respect to its dealings with Mann were the result of Pioneer's own misconduct and willful disregard of Mann's illegal activities.

248. It is against equity and good conscience to permit Pioneer to retain the tax trust funds and any interest it has earned from same.

249. Pioneer should be ordered to release the Trust Funds back to Plaintiff, or to a receiver for payment to the appropriate parties and taxing jurisdictions, and to disgorge any interest or profits it has earned by way of its wrongful retention of the Trust Funds.

**SIXTH CAUSE OF ACTION**
**(VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS**
**ACT, 18 U.S.C. § 1962(c))**

250. Plaintiff incorporates the allegations contained in paragraphs 1 through 249 above as if fully recited herein.

251. Each Defendant is a "person" capable of holding legal or beneficiary interest in property within the meaning of 18 U.S.C. § 1961(3).

252. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described above, and as further described below.

253. From at least 2014 through September 4, 2019, Mann, the Mann Entities, and Pioneer were associated with and comprised an "enterprise" within the meaning of 18 U.S.C. § 1961(4) that engaged in acts and activities that affected interstate commerce, including money laundering (the "RICO Enterprise"). At all relevant times, the RICO Enterprise constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

254. The purpose of the RICO Enterprise was to obtain third-party employer tax and payroll payments from employers and their payroll service providers throughout the country and to use those third-party tax and payroll funds to cover any overdrafts in other Mann Entity Accounts, pay down the ValueWise Loan, and otherwise to benefit Mann, Pioneer, and the RICO Enterprise. Defendants intended to and did in fact hide, launder, and otherwise wrongfully retain the third-party employer tax and payroll funds.

255. Defendants knew that their use of the third-party funds was not authorized by the third-party employers and/or their payroll service providers bound to collect said funds. Defendants diverted the third-party funds to other Mann Entity accounts to conceal the nature, source, ownership and control of the third-party funds.

256. The RICO Enterprise had a discernable structure. Mann had the most significant degree of control over the affairs of the RICO Enterprise and controlled the flow of the third-party payroll and tax funds. Pioneer, primarily through Blessing, Fleming, and Benedict, provided Mann with substantial assistance and the necessary approvals and encouraged Mann to divert third-party funds from the 0212 Tax Account and the 2440 Tax Account to other Mann Entity Accounts and to reduce the balance of the ValueWise Loan. Pioneer also assisted Mann by concealing his money laundering activities from ValueWise Loan participants, and from federal regulators including FinCEN. At all relevant times, Pioneer knew that Mann was engaged in fraudulent activity and that the third-party employer payroll and tax funds were transferred to other accounts owned and controlled by Mann at Pioneer bank through wrongful criminal conduct. Pioneer knew that by assisting and encouraging Mann to divert third-party payroll and tax funds from the MyPayrollHR and Cloud Payroll accounts, and concealing his money laundering from third parties, it was participating in and facilitating that unlawful conduct.

257. On and after August 30, 2019, Pioneer took control of the RICO Enterprise, and diverted third-party payroll and tax funds from the MyPayrollHR and Cloud Payroll accounts to its own accounts and to pay down the ValueWise Loan. Pioneer also wired, with the intent to defraud, stolen third-party employer tax funds in an amount exceeding $10,000 other ValueWise Loan participant banks.

258. The RICO Enterprise was distinct from the predicate acts of money laundering. Mann and the Mann Entities engaged in various lawful activities, including consulting work and payroll processing services, and Pioneer executed certain lawful commercial banking transactions on behalf of Mann and the Mann Entities.

259. Each of the Defendants agreed to and did conduct, participate in the conduct of,

operate, and manage the affairs of the RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and in violation of 18 U.S.C. § 1962(c).

260. The racketeering activities committed by the Defendants all had the same or similar purposes, results, participants, victims, and methods of commission, and they were not isolated events. As described above, the Defendants engaged in numerous predicate acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, which occurred on a regular basis from 2014 at least through September 4, 2019 and would have continued but for Bank of America's freezing of the Mann Entities' bank accounts held at Bank of America, and thus constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

261. Defendants knew that the transfer of third-party payroll and tax funds from the MyPayrollHR and Cloud Payroll accounts to other Mann-controlled accounts or to third parties were designed to conceal or disguise the nature, location, source, ownership, or control of the converted funds.

262. Defendants' transactions affected interstate and foreign commerce because (a) proceeds of specified unlawful activity were deposited in financial institutions in the United States, (b) converted funds were moved by ACH, wire, and other means that affected interstate commerce, and (c) financial institutions that are engaged in, or the activities of which affect, interstate or foreign commerce were used to facilitate the illegal transactions.

263. From 2013 through September 2019, Plaintiff was a reasonably foreseeable and/or anticipated victim of Defendants' racketeering activity.

264. As a direct and proximate result of, and by reason of, the activities of Defendants, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in their business and property, within the meaning of 18 U.S.C. § 1964(c).

265. As described above, as a result of Defendants' misconduct, Plaintiff has been damaged in the amount of at least $416,866.62, and has incurred and will continue to incur substantial costs in seeking to obtain disgorgement of the third-party tax funds.

266. Plaintiff is entitled to recover and seeks threefold the damages it has sustained together with the cost of the suit including costs, reasonable attorney's fees and reasonable experts' fees.

## SEVENTH CAUSE OF ACTION
### (VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d))

267. Plaintiff incorporates the allegations contained in paragraphs 1 through 266 above as if fully recited herein.

268. Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate RICO, 18 U.S.C. § 1962(c).

269. In connection with the RICO Enterprise, Pioneer and Mann agreed to accomplish an unlawful plan to engage in a pattern of racketeering activity.

270. Pioneer and Mann agreed to the overall objective of the conspiracy, and agreed to commit at least two acts of racketeering, including but not limited to money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

271. As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Plaintiff has been injured in its business or property.

272. The unlawful actions of Defendants, and each of them, have directly, legally, and proximately caused injuries to Plaintiff in its businesses.

273. As described above, as a result of Defendants' misconduct, Plaintiff has been damaged in the amount of at least $416,866.62, and has incurred and will continue to incur substantial costs in seeking to obtain disgorgement of its payroll and payroll tax funds.

274. Plaintiff is entitled to recover and seek threefold the damages it has sustained together with the cost of the suit including costs, expenses reasonable attorney's fees and reasonable experts' fees.

## EIGHTH CAUSE OF ACTION
### (AIDING AND ABETTING CONVERSION – PIONEER)

275. Plaintiff incorporates the allegations contained in paragraphs 1 through 274 above as if fully recited herein.

276. On and after August 30, 2019, Pioneer and Mann knew that if the 0212 and 2440 Tax Accounts, and/or the 0428 Payroll Account, were partially "frozen," *e.g.*, that Pioneer would allow ACH credit/deposit entries but would hold and later return debit/withdrawal entries, the payroll service bureaus' employer-clients would continue to authorize their payroll service providers to fund these accounts in anticipation of their future remittance to their employees and the appropriate taxing authorities.

277. Pioneer and Mann knew and agreed that Pioneer would continue to accept the credit/withdrawal entry side of the transfers of payroll and payroll tax trust funds into the accounts, and would delay return of the debit/withdrawal entry side of the transfers, so that neither the payroll companies, nor their employer-clients, would learn of the Trust Funds non-remittance to the appropriate parties until it was too late to reclaim the Trust Funds.

278. Defendants agreed that Pioneer would convert the Trust Funds to reduce Mann's debts to Pioneer.

279. Plaintiff has demanded return of the Trust Funds, but Pioneer has refused to disgorge its ill-gotten gains.

## NINTH CAUSE OF ACTION
### (AIDING AND ABETTING FRAUD – PIONEER)

280. Plaintiff incorporates the allegations contained in paragraphs 1 through 279 above

as if fully recited herein.

281. Beginning in about 2014 through September 2019, Mann engaged in a fraudulent scheme whereby he induced third-party employers to enter into agreements pursuant to which Mann's payroll companies would, among other things, process payroll and tax payments.

282. From 2017 through September 2019, Mann engaged in a fraudulent scheme whereby he induced MyPayrollHR, Southwestern Payroll, and ProData to collect third-party payroll and payroll tax funds of its employer-clients, knowing his intent to money launder and kite checks with those funds.

283. Mann failed to disclose to anyone other than Pioneer that Mann would engage in money laundering by diverting and using the third-party payroll and payroll tax funds deposited to the 0212 and 2440 Tax Accounts, and/or the 0428 Payroll Account. Pioneer sanctioned, facilitated, and encouraged these actions.

284. Plaintiff would not have allowed the deposit of its Trust Funds to any accounts at Pioneer bank had it known that Mann would engage in money laundering by diverting and using its Trust Funds for anything other than toward application of its payroll and payroll tax liabilities, and that Pioneer would sanction, facilitate, and encourage these actions.

285. Mann and Pioneer knew that the Trust Funds were entrusted to the payroll service bureaus, and that they should not be used for any purposes other than paying payroll liabilities and the tax/treasury funds to the appropriate taxing authorities.

286. Pioneer knew that the payroll service bureaus were collecting payroll and tax funds for their employer-clients and that both were operating under the belief that Mann was not diverting the Trust Funds deposited to the Mann Entity Accounts for purposes other than paying third-party payroll and payroll taxes.

287. Nonetheless, Pioneer enabled, facilitated, and provided substantial assistance to Mann in committing fraud by, among other things,

      a.     allowing and at times requiring Mann to move the Trust Funds from the 0212 and/or the 2440 Tax Accounts and/or the 0428 Account to other Mann Accounts to cover overdrafts;

      b.     allowing and at times requiring Mann to use the third-party funds in the 0212 and/or the 2440 Tax Accounts and/or the 0428 Account to pay down the ValueWise Loan;

      c.     failing to report suspicious activities in Mann's Accounts to regulatory authorities;

      d.     allowing Mann to use the MyPayrollHR and Cloud Payroll accounts as collateral for the ValueWise Loan and other loans extended to the Entity Defendants;

      e.     conspiring with Mann to ensure that the payroll service bureaus continued to transfer their employer-clients' Trust Funds to the 0212 and 2440 Tax Accounts, and/or the 0428 Account, knowing that Pioneer would use the Trust Funds to offset any debts of Mann or the Mann Entities to Pioneer;

      f.     converting the Trust Funds on and after August 30, 2019; and

      g.     transferring third-party tax funds from the 2440 Tax Account to pay down the ValueWise Loan on or about September 4, 2019.

288. As a result of Mann's fraud and Pioneer's substantial assistance, Plaintiff has been injured in an amount no less than $416,866.62.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby requests a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**For the foregoing reasons,** Plaintiff respectfully seeks a judgment in its favor and against the Defendants as follows:

1.      For a declaration with respect to the rights of the parties vis-à-vis the tax funds, specifically, a declaration that Pioneer wrongfully seized the third-party employer tax funds and that it must return Granite Solutions' twice-paid tax funds to it, and disgorge any interest or profits it has earned by way of its wrongful retention of the tax funds;

2.      For compensatory damages in an amount in excess of $1,000,000.00, plus penalties and interest charged, accounting fees, loss of billing and client expense, loss of business profits, and reputational harm;

3.      For an award of three times the damages sustained by Plaintiff;

4.      For an award of punitive damages, pre-judgment and post-judgment interest at the highest rates allowable by law, attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by law; and

6.      Such other and further relief as the Court deems just and equitable.

Respectfully submitted,

By:    *s/ Michael A. Kornstein*
        Michael A. Kornstein, Esq.
        Bar Roll No. 103178
        COOPER ERVING & SAVAGE LLP
        LOCAL COUNSEL FOR PLAINTIFF
        39 North Pearl Street, 4th Floor
        Albany, NY 12207
        Telephone: (518) 449-3900
        mkornstein@coopererving.com


        Andrew C. Jayne, Esq.
        (*pending pro hac vice admission*)
        BAUM GLASS JAYNE CARWILE & PETERS
        401 S. Boston Ave., Suite 2000
        Tulsa, OK 74103
        Telephone: (918) 938-7944
        ajayne@bgjclaw.com